F. O. WHITTEN, JR., AND MARY E. WHITTEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Whitten v. Commissioner
Docket No. 3260-74.
United States Tax Court
T.C. Memo 1980-245; 1980 Tax Ct. Memo LEXIS 338; 40 T.C.M. (CCH) 625; T.C.M. (RIA) 80245; July 14, 1980, Filed *338 Petitioner, French O. Whitten, Jr., was a Circuit Court Judge of the 30th Judicial Circuit of Alabama from January of 1965 until January of 1971, and as such had jurisdiction to grant divorces. Held: 1. French O. Whitten, Jr., received fees for signing divorce decrees during 1967-70 which he did not report on his income tax returns for those years. Amounts to be determined under Rule 155, Tax court Rules of Practice and Procedure.
2. The underpayment of tax for each of the years 1967-70 due to the failure to include the fees in income was due to fraud. 3. The tax returns filed by petitioners for 1967 and 1968 were false of fraudulent with intent to evade tax. 4. Petitioner, Mary E. Whitten, was an innocent souse within the meaning of sec. 6013(e), I.R.C. 1954, for each of the years 1967-70, and shall be relieved of liability for the tax and additions to tax for each of those years in which the omitted income attributed to French O. Whitten, Jr., was in excess of 25 percent of the gross income stated in the returns for those years. J. Michael Rediker and Thomas A. Ritchie, for the petitioners. Frank Simmons , for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION *339 DRENNEN, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Addition to tax
Year
Deficiency
sec. 6653(b), I.R.C. 1954
1967
$50,078.26
$ 25,039.13
1968
68,358.34
34,179.17
1969
104,038.92
52,019.46
1970
21,811.53
12,193.22
1971
949.94 [1]
After concessions the issues remaining for decision are: (1) Whether petitioners realized income from fees relating to the signing of divorce decrees during 1967, 1968, 1969, and 1970. (2) Whether petitioners are liable for additions to tax for fraud for each of the years 1967, 1968, 1969, and 1970. (3) Whether the statute of limitations bars assessment and collections of any deficiencies found to be owing for 1967 and 1968. (4) Whether petitioner Mary Whitten is an innocent spouse entitled to relief from liability for the tax under section 6013(e), I.R.C. 1954. [2]
FINDINGS *340 OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. French O. Whitten and Mary E. Whitten, the petitioners herein, are husband and wife, whose residence was in Birmingham, Ala., at the time of the filing of their petition. Petitioners filed their joint Federal income tax returns for the years 1967 through 1971 with the Internal Revenue Service Center, Chamblee, Ga. Mary is a party to this action solely by reason of having filed joint returns for th years in issue; therefore, when we hereinafter refer to Whitten or petitioner, we will be referring solely to French. From January 15, 1965, through January 15, 1971, Whitten was the Circuit Judge of the 30th Judicial Circuit of the State of Alabama, covering St. Clair and Blount Counties. St. Clair County has two courthouses, one in Pell City and the other in Ashville. Blount County has one courthouse located in Oneonta. In his capacity as a circuit judge, Whitten held court in all three courthouses in the 30th Judicial Circuit. From time to time, Whitten also presided by special designation as a circuit *341 judge in matters pending in courts other than in the aforementioned cities. As circuit judge Whitten handled all the civil, criminal, equity, and Grand Jury dockets in the 30th Judicial Circuit. As circuit judge, Whitten was empowered to appoint registers in chancery of the courts of St. Clair and Blount Counties. In that capacity, Whitten appointed Mary E. Gilliland as register in chancery in Oneonta, Blount County. In December 1965 Mary E. Gilliland ceased to be register in chancery, and on December 28, 1966, she married Whitten and is the petitioner-wife herein. Mary never worked in the courthouse in Pell City. In January 1965 Whitten appointed his sister, Ann Love, as register in chancery in Pell City and Ashville, St. Clair County. Ann Love continued to serve in that capacity until January 1971. Included amoung the duties of the register in chancery was the obligation to record and index all decrees of divorce granted in that particular county. The decrees would be indexed alphabetically according to the names of both plaintiff and defendant. During the period Whitten was a circuit judge, it was customary in Alabama not to require any trial or hearing in open court of *342 uncontested divorces. In most of these cases the testimony was taken before some person appointed as commissioner for that purpose. It was not unusual for the secretary of the attorney who was the solicitor of the divorce complaint to act as commissioner. The record of an uncontested divorce generally consisted of a divorce complaint, or Bill of Divorce, containing sworn testimony of the complainant given before a commissioner, an Acceptance of Service of Process and Answer and Waiver of Respondent, and a Final Decree of Divorce. If children and property were involved, the file would sometimes also include a custody agreement and property settlement. It was customary for the lawyer handling the uncontested divorce (1) to prepare all the papers, including the proposed divorce degree to be signed by the judge; (2) to carry the full record in the diorce case to the judge for his signature; (3) to see that the record, including the signed divorce decree, was filed in the register's office; and (4) to see that the appropriate filing fees or costs were paid to the register's office.
It was not customary in the 30th Judicial Circuit for the judge or his staff to file the divorce decree *343 with the Register of Chancery nor to make a check of the records and indexes of the register's office to see whether divorce decrees had been properly filed and indexed or whether the court costs or filing fee had been paid. This was generally the obligation of the parties to the divorce or their attorneys. During a 34-year period which ended in 1967, John Ike Griffith (Griffith) practiced law in Birmingham, Ala. In that year Griffith was disbarred. His disbarment was grounded upon the fact that Griffith represented to various courts in the State that the plaintiff or defendant in certain divorce proceedings was a bona fide resident of Alabama when in fact Griffith knew or had reason to believe that this was not the case. See In Re Griffith, 219 So.2d 357, 283 Ala.527 (1969). However, he continued to hold himself out as a practicing attorney until sometime in 1970; his practice consisted solely of handling of uncontested divorces for out-of-State parties. Frieda Sue Cook (Cook) was employed as secretary to Griffith from 1963 until May 1968. Shirley Bowman (Bowman) served in that position from 1968 through August 1970. Included among their duties as Griffith's secretaries *344 were acting as commissioner and taking testimony from the parties to an uncontested divorce and typing up the various papers necessary for a complete disposition of a divorce case. Based only on the evidence received during the course of the trial of this case, we make the following findings of fact. They are not intended to be conclusive with respect to any other case, such as that of Griffith, in which different evidence of the same arrangement and transactions might be presented. Early in 1967 Griffith met with Whitten in Pell City. [3] *345 *346 This meeting was arranged by a mutual friend. At this meeting an arrangement was reached to enter a joint undertaking to obtain divorces. Pursuant to this agreement, Griffith was to take testimony from his clients who were complainants in divorce proceedings, collect the legal fees and costs, and submit the papers to Whitten in proper form. Whitten, in turn, was to sign the completed divorce decrees and was to receive a part of the legal fee for each decree that he signed. Initially, the paperwork was completed in Griffith's office; the completed forms were then taken by Cook to Whitten for signing. Sometime later the signed forms were delivered back to Griffith. Later the arrangement changed. Under the new arrangement Whitten obtained standard, preprinted forms for divorce decrees, [4] to which forms the signatures of Whitten and Ann Love n4a would be affixed at the bottom.The remainder of the forms were left blank. The signed forms would then be delivered to Griffith's office where the necessary paperwork would be done. Once completed, the decrees would be returned to Whitten. These divorce decrees *347 were furnished by Whitten to Griffith in denominations of either 10, 20, or 40, and were then accounted for and filed by the secretary. They were always delivered in signed form; therefore, neither Griffith nor his secretaries ever witnessed Whitten sign his name to the decrees. When clients came into the office seeking a divorce, Griffith would first meet with them to gather the necessary information. Griffith would then dictate the testimony to his secretary who would act as commissioner. The secretary would then type the information on standard forms, including those furnished by Whitten, and the completed forms would then be presented to the clients for signature. A gold impression of the seal of St. Clair County would then be embossed upon the divorce decree.If a mistake was made while typing a divorce decree, the secretary would write void across the face of the decree and retain this voided document for Whitten to inspect. Upon completion of the proper forms, Griffith would receive his fee, which, according to him, varied between $275 and $465 per case. Of this fee, approximately 40 percent would be paid to the attorney who forwarded the case, approximately 50 percent was *348 paid to Whitten as his fee, and Griffith retained the remaining 10 percent. [5] Griffith dealt with his clients strictly on a cash basis and kept no financial records of his affairs. Due to the absence of records, it is impossible to determine the number of cases he handled at a particular fee within the above fee range. After completion of the papers and payment of the fee, the name of the client would be entered by the secretary onto an index (hereinafter clients list). A clients list was kept yearly by Griffith. These lists contained the name of the client followed by a 3-digit number (which apparently was the number assigned to the case) and the name of the court in which the divorce was purportedly obtained. After the clients' names had been entered on the yearly list, the completed *349 files were thereafter left in Griffith's private office. At this time Griffith would total the number of cases and place a certain amount of cash in an envelope.This amount represented Whitten's share of Griffith's fees per case. The files and the cash would then be locked in Griffith's office for future delivery to Whitten. On one occasion Cook witnessed Griffith counting out divorce decrees and cash. For each completed decree Griffith counted out cash, on an alternating basis, in increments of either $220 or $162. The cash was then placed in a small envelope with the client's name written upon it and then locked in Griffith's filing cabinet. Cook subsequently observed Griffith placing these envelopes containing cash into a larger envelope, which she then delivered to Whitten. On occasions Whitten would meet personally with Griffith at the latter's office. With few exceptions the meetings would take place after office hours or on Saturday. On these occasions Whitten would receive his fee per case and would also drop off additional signed decrees, in the usual denominations. Whitten would also be shown the voided decrees so a necessary fee adjustment could be made to take *350 those decrees into consideration.These meetings occurred throughout 1967, 1968, 1969, and 1970, and Whitten was paid in cash personally by Griffith in each of these years. In addition to the above meetings, Whitten also met with Griffith at the office for a legitimate purpose. On this occasion a sale of two quarter horses from Whitten to Griffith was consummated. Both Cook and Bowman have observed Whitten, on occasions, entering Griffith's office. If Griffith's office was out of pre-signed divorce decrees, the office called Whitten and arranged to meet him to replenish their supply. Both Cook and Bowman met with Whitten on various occasions, usually in the parking lot of the Eastwood Shopping Mall. The secretaries were given an envelope by Griffith and instructed to deliver it to Whitten. They were additionally instructed to pick up an envelope from Whitten for delivery back to Griffith. Pursuant to Griffith's instructions, the secretaries did in fact meet with Whitten and exchange envelopes with him. 5a *351 The packages received by the secretaries from Whitten contained the standard, preprinted divorce decrees which were signed by him. On occasion Bowman met, and exchanged packages with, Mary at the Eastwood Mall. During the taxable years in issue, Mary neither knew nor met with either Griffith or Cook. In addition to meeting Whitten at Eastwood Mall, Bowman recalled two other contacts with Whitten. On one occasio Bowman infored Whitten, by telephone, of the fact that the St. Clair County seal used by the office was broken. At that time Whitten instructed her to place an order for another seal. She subsequently ordered and received this seal.On another occasion she received a handwritten printed note addressed "to Shirley" which stated: For the *352 next few weeks would Mr. Griffith be interested in sending about 2 cases each week up here, with good names which we could put on record. It's still very hot!!! up here. They are watching every move I make. We are almost certain that we are being followed and watched, (politics you know!!!!) F.O.W: 5b
On August 14, 1970, U.S. Postal Inspectors Charles Davis (Davis) and J. W. Holland served a search warrant on Griffith and searched his office. Among the documents found in Griffith's office and seized pursuant to this warrant were as follows: (1) A letter from Bowman addressed to Bell Company, Inc., which letter placed an order for a pokcet seal.The seal was to be delivered to Griffith's office; (2) the above-mentioned handwritten note addressed to Shirley; (3) an envelope with the return address of F.O. Whitten, Jr., Judge, Thirtieth Judicial Circuit, Courthouse, Pell City, Ala., 35125; (4) Griffith's clients lists for 1967, 1968, 1969, and 1970; (5) a number of purportedly competed divorce files; and (6) 14 blank divorce decrees signed in Whitten's name.
L.S. Waid (Waid) served two terms as Circuit Judge of the 30th Judicial Circuit consisting *353 of Blount and St. Clair Counties, Ala. He was both Whitten's predecessor, having served from 1959 to 1965, and Whitten's successor, having been reelected in 1970 and having begun a new term in January 1971. Upon making his rounds of the three courthouses in the 30th Judicial Circuit after he succeeded Whitten as judge in early 1971, Waid came upon a small anteroom off the judge's office in the Pell City courthouse. This room, which was opened for Waid by the janitor, was 3 to 4 feet deep and 5 or 6 feet wide. The only access to this room was through the judge's office.
Upon entering the anteroom, Waid found it contained a metal cabinet which took up about half of the room space. The cabinet was locked, but Waid's court reporter worked with the metal door until it opened. Waid found that every shelf of the cabinet contained files. He examined two or three of the files and found what purported to be divorce decrees and proceedings in divorce cases. Barbara Warden, a court reporter at the courthouse in Pell City, had a desk in Whitten's office and also answered his telephone. Warden used the anteroom as a supply closet. During office hours the door to the anteroom was always kept *354 open, so that she had easy access to her supplies. As of late 1970, when Warden left her job, she had never seen the files which were subsequently found in the anteroom. [6] After discovering these divorce files, Waid called or sent for St. Clair County Sheriff Clemons Roe (Roe), who arrived in the anteroom within approximately 10 minutes. Upon Waid's instructions, Roe took custody of the files. Roe set up work tables in the judge's office and personally moved the files from the metal cabinet in the anteroom to the work tables. He assembled a crew of approximately 16 persons, including Waid and Postal Inspector Davis, [7] to list the names of the parties on the divorce decrees found. After all the files were listed, Roe packed them in cardboard boxes and dated and initialed each box. *355 He then loaded the files into Davis' automobile and received a receipt from Davis. During the period that Davis had the divorce files in his custody he made an alphabetical list and found that there were 2,295 such files (hereinafter referred to as the Davis list).None of the 2,295 divorce files found in the anteroom in Pell City had been recorded in the Chancery Court index. When compiling this list no inspection was made to determine whether any of the decrees found were actually and presonally signed by Whitten.
For the years in issue, the Davis list for the most part contained names which were also contained on Griffith's clients list. There were, however, 53 names on the Davis list for which there was no corresponding entry on the clients lists. The Davis list showed the following number of divorce decrees were dated during the following years: 1967
548
1968
643
1969
874
1970
224
Examinations of the documents found in Pell City were conducted by both respondent's expert and petitioner. The purpose of the examinations was to determine the genuineness of the F. O. Whitten, Jr., signatures appearing at the bottom of the decrees. Respondent's expert examined 954 of such documents, *356 while Whitten examined all of them. Respondent's expert determined that (1) affixed to approximately 62 percent of the documents he examined was the genuine signature of F. O. Whitten; (2) Whitten could not be eliminated as the author of the signatures appearing on an additional 33 decrees (approximately 3.46 percent), and (3) the signatures on the remaining documents were not those of F. O. Whitten. A majority of the signatures not made by petitioner were written by the same person. Petitioner determined that approximately 57 percent of the decrees bore his genuine signature, that 20 decrees (approximately 2.1 percent) were not susceptible to definitive analysis, and that the remainder of the decrees were forged signatures. The forgeries were done in a skillful manner so at first glance they appeared to be the genuine signatures of F. O. Whitten. It appears that the author of these signatures spent considerable time perfecting the duplications. Physical inspection of the divorce decrees revealed that 17 of the decrees found in the Pell City Courthouse were signed by one J. H. Martin or John H. Martin as solicitor for the complainant rather than by John Ike Griffith or a party *357 acting pro se. None of the names appearing on these decrees correspond with any names appearing on Griffith's clients lists. These cases were not subject to the agreement between Whitten and Griffith. All these decrees were dated during 1967. In addition, during the examination o the divorce decree files, 34 fully typewritten annulment decrees were found. These decrees differed from the majority of the decrees in that they were not typed upon a standard printed form. Due to the varying lengths of these decrees, they could not have been presigned by Whitten. On August 20, 1970, a Federal Grand Jury in the Northern District of Alabama returned an indictment against Whitten, Griffith, Ann Love, and Shirley Bowman. Count one of the indictment charged Whitten and the others with conspiring to use the United States mails to defraud in violation of 18 U.S.C. section 371, by transmitting to nonresidents of Alabama through the mails false and fraudulent representations and other documents relative to obtaining a divorce in Alabama and the validity thereof, and sending them divorce decrees purporting to be signed, filed, and recorded in Alabama when they knew that such decrees had not *358 been filed and recorded. Included in this indictment as an overt act forming a part of the conspiracy was the allegation that Whitten caused to be delivered to Griffith the note mentioned at page 14, supra.
On May 15, 1972, Whitten entered a plea of guilty to count one of the indictment. He was sentenced to 3 years imprisonment, 6 months to be actually served, with the remaining 30 months suspended.He subsequently lost his license to practice law as a result of this guilty plea. Griffith was subsequently tried and convicted of this offense. The indictment against Shirley Bowman was dismissed and she testified in Griffith's trial, as did Frieda Sue Cook. On November 4, 1966, Mary placed an order with the Foreign Car Center, Inc., for a 1967 MGB Roadster. The total cash price of the roadster was $2,962.70. Mary was allowed a trade-in of $1,300 on her old car and paid the balance of $1,662.70 the next day in cash. This purchase was made approximately 1 month prior to her marriage to Whitten and also before Whitten entered into the agreement with Griffith. On August 14, 1967, Mary placed an order with the same car dealership for a 1967 Jaguar XKE roadster. The total cash price *359 of this car was $6,847.50. Mary was allowed a trade-in of $2,500. The remaining balance of $4,347.50 was paid by a cash payment of $3,000 on August 14, 1967, and a cash payment of $1,347.50 on August 30, 1967. Whitten gave Mary $1,000 to pay for this car; the balance was paid by Mary with funds obtained from a divorce settlement relating to her prior marriage. In the spring of 1971, the petitioners sold their home in Pell City, Ala., receiving a check in the amount of $29,555 from the purchaser for the equity in the house. They have since used this money to pay for personal living expenses. They did not thereafter purchase another home. At the time of trial petitioners were living in a two-room guest house on Whitten's brother's property. On June 14, 1971, Whitten placed an order with Bart Starr Lincoln-Mercury, Inc., for a 1970 Continental Mark III. The total cash price of the Continental was $7,495. Whitten was allowed a trade-in of $2,099 on a 1967 Ford T-Bird. Of the remaining balance of $5,400 due and owing, $2,000 was paid in cash on June 4, 1971, and the remaining balance was financed. During the period beginning in 1967 and ended 1971, Whitten purchased each of *360 the following automobiles: a 1967 Ford Thunderbird, a 1969 Chevrolet, a 1968 Dodge Charger, and the 1970 Continental mentioned supra. Each time Whitten acquired one of the above autos, he traded in the previous car he was then driving. There is no evidence which indicates substantial amounts of unexplained cash in petitioners' bank accounts, increase in the net worth of petitioners, lavish lifestyle, or expenditures in excess of reported income. Throughout the period subsequent to January 1, 1967, the Whittens have lived a middle class lifestyle which can be described as modest. At the direction of Whitten, Mary would occasionally meet attorneys to pick up documents for delivery to Whitten. Usually, Mary would be in the neighborhood of the attorneys' office and would drop in as an accommodation to him. On one or two occasions Mary met a lawyer's secretary at Eastwood Mall. On these occasions Mary exchanged packages with the secretary. Mary never looked inside the packages or inquired of Whitten as to their contents, nor did she attach any significance to these meetings. Petitioners' tax returns for the years in issue were prepared by William Waldrop, a CPA. Mary never had *361 any discussions with Waldrop about the preparation of the returns nor did she supply any information to Waldrop. All matters regarding household finances, including the paying of bills, were handled by Whitten. At the time of the filing of the returns in issue, Mary reasonably believed that all income received by them had been reported. In 1972 Revenue Agent Billy Tolleson (Tolleson) was assigned to examine petitioners' Federal income tax returns for the years in issue.Pursuant to his investigation, he examined the bank records, loan records, and safe deposit box of petitioners. When reconstructing petitioners' income he did not rely on the so-called "net worth," "bank deposits," or "receipt and disbursements" method of showing omitted income, the reason being that none of the funds received by Whitten pursuant to the arrangement with Griffith could be traced pursuant to these methods. The notice of deficiency was based exclusively on the "specific items" method. The computations set forth in the notice of deficiency were as follows: Tax year
Number of Divorces
Avg. Fee
Total
1967
520
$191
$ 99,320
1968
637
191
121,667
1969
875
191
167,125
1970
266
191
50,806
Tolleson relied exclusively on the Davis *362 list of decrees taken from the anteroom in the Pell City Courthouse. Basically he broke down the alphabetized list by year and determined that all the decrees dated during a specific taxable year were subject to the agreement between Whitten and Griffith. In making this compilation Tolleson did not examine the underlying divorce decrees and, therefore, did not know whether the signature on the document was genuine or whether the document was signed at all. Additionally, he did not check to see if the decrees were signed by an attorney other than Griffith as solicitor. During the course of Tolleson's investigation, the mail fraud trial of Griffith commenced. Cook testified at that trial that she had witnessed Griffith counting money on an alternating basis of $220 and $162. She further testified that these amounts were placed in envelopes for delivery to Whitten. Tolleson determined the average of these amounts ($191) represented the average fee Whitten recived for each divorce. Tolleson obtained this information by review of the transcript of Cook's testimony and by personally contacting Cook by telephone. No information given by Griffith or Bowman was used by Tolleson in forming *363 the basis of his determination. Tolleson made no further effort to determine what Whitten could have done with this large amount of unreported income. ULTIMATE FINDINGS OF FACT (1) Whitten received an average fee of $185 per divorce decree. Whitten received this fee for every decree found in the anteroom in the Pell City Courhouse which bears his genuine signature and which corresponds to a party's name on Griffith's clients list. (2) Whitten's omission of these fees from his Federal income tax returns for the tax years 1967, 1968, 1969, and 1970 was due to fraud. (3) Petitioners' returns for the years 1967 and 1968 were false or fraudulent with intent to evade tax. (4) Mary did not know, nor have reason to know, at the time of her signing the returns for 1967, 1968, 1969, and 1970 of the omissions from income therefrom. (5) Mary did not significantly benefit from the omitted items of income. OPINION Fraud
The first issue we must decide is whether petitioner omitted from gross income during the taxable years 1967, 1968, 1969, and 1970 fees that he received in return for granting "quickie divorces." It is conceded that such fees were not reported on petitioners' income tax returns *364 for the above tax years, and it is also evident that such fees, if received, constitute income subject to tax. Sec. 61(a)(1). If we decide that petitioner did in fact receive such fees, we must next determine whether the omission from gross income of these items was the result of a fraudulent intent to evade tax. The issue of fraud in this case is important in two contexts. Initially, respondent has determined that additions to tax for fraud, sec. 6653(b), are applicable for 1967, 1968, 1969, and 1970. Secondly, the general 3-year statute of limitations bars assessment and collection of any tax found to be owing for 1967 and 1968. Sec. 6501(a). For respondent to prevail for those years it is necessary to find that the returns in question are false or fraudulent with intent to evade tax. Sec. 6501(c). The question of fraud is one of fact and is to be ascertained from the entire record by examination of taxpayer's entire course of conduct. Fiorella v. Commissioner,361 F. 2d 326 (5th Cir. 1966), affg. a Memorandum Opinion of this Court. It is respondent's burden to prove the existence of fraud, and he must do so clerly and convincingly. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; *365 Stoltzfus v. United States, 398 F. 2d 1002 (3d Cir. 1968); Imburgia v. Commissioner,22 T.C. 1002 (1954). Although fraud is never to be imputed or presumed, its proof may depend to some extent upon circumstantial evidence and may rest upon reasonable inferences properly drawn from the record. Stone v. Commissioner, 56 T.C. 213 (1971); Otsuki v. Commissioner, 53 T.C. 96 (1969). On brief petitioner apparently assumes, especially with respect to 1967 and 1968, that respondent must prove by clear and convincing evidence the amount of tax that is due. This is simply not the case. Respondent need only establish that during each taxable year in issue there was some underpayment which was due to fraud, and that the return filed was fraudulent with intent to evade tax. Once this is done, the bar of the statute of limitations is lifted and the civil fraud penalty may also be assessed. Plunkett v. Commissioner, 465 F. 2d 299 (7th Cir. 1972); Byran v. Commissioner, 209 F. 2d 822 (5th Cir. 1954); United States v. Chapman, 168 F. 2d 997 (7th Cir. 1948). Additionally, the full amount of the deficiency will be sustained unless the taxpayer comes forward with evidence showing respondent's determination *366 erroneous. Byran v. Commissioner, supra; Cohen v. Commissioner, 9 T.C. 1156 (1947). It is, therefore, apparent that for respondent to prevail on this issue, he need only show that petitioner fraudulently, with intent to evade tax, omitted some income from his tax returns for each [See illustration in Original] In recognition of his burden of proof, respondent endeavored to link petitioner to the receipt of income during each of the taxable years in issue. Upon review of the record, we are satisfied that the evidence clearly and convincingly points to a conclusion that petitioner did receive income in the form of fees for signing divorce decrees during 1967, 1968, 1969, and 1970. The evidence upon which we rely is as follows. Griffith testified to the existence of an agreement between him and Whitten where, in return for a fee, Whitten would sign blank divorce decrees. He testified that this agreement was consummated in 1967 and continued through 1970 when Federal agents closed down his operations. He further stated that at the end of each day Whitten's fee would be put aside for future pickup by, or delivery to, Whitten. Griffith paid this money to Whitten on numerous occasions *367 during each tax year.
Griffith's secretaries, Cook and Bowman, corroborated substantial parts of this story. They additionally testified to numerous meetings with Whitten at the Eastwood Mall. At these meetings the secretaries would exchange packages with Whitten. Cook affirmatively stated that on more than one occasion the package she delivered contained money. While Bowman could not confirm the fact that the packages she delivered did contain money, she did not dispute Griffith's testimony on this matter.
By the testimony of these three witnesses, we believe that respondent has made a prima facie showing that Whitten received income that was subject to tax during all years in issue. Petitioner seeks to impeach their testimony by contradicting their stories with his own. He contends that he neither had association with Griffith nor received any fees from him. In addition to his testimony, he relies on independent evidence which shows that his net worth has not increased; nor is there any evidence of lavish lifestyle. He explains the divorce decrees with his genuine signature affixed to them by stating that he signed them in normal discharge of his duties as circuit judge. Initially, *368 the fact that respondent has produced no evidence of increase in net worth or lavish lifestyle, while casting some doubt on the magnitude of the omitted income, does not convince us that petitioner did not receive income. As he dealt exclusively on a cash basis, it does not necessarily follow that the cash received would be discovered through bank books or net worth. Petitioner might very well have it hidden somewhere. We are also not required to accept at face value testimony we find to be improbable or lacking in credibility. Archer v. Commissioner, 227 F. 2d 270 (5th Cir. 1955); Boyett v. Commissioner, 204 F. 2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. On its face petitioner's explanation as to how his signature was affixed to the decrees is not improbable. But, an examination of the record reveals too much unexplained evidence contradicting his story. In light of this evidence we are forced to conclude that Whitten's story of nonparticipation in the scheme is too improbable to be believed. In the first place, we have three witnesses, Griffith, Cook and Bowman, who affirmatively testified to Whitten's participation in the scheme. Griffith testified *369 to the fact and nature of the arrangement from which Whitten was to receive a fee for granting the divorces. He further testified to personally paying Whitten or sending the fees to him. Both Cook and Bowman testified to meeting Whitten on numerous occasions, including those at Eastwood Mall where they exchanged packages with him. Additionally, Bowman testified to receiving telephone authorization from Whitten to order a duplicate official seal of the St. Clair County Court from which to emboss the decrees which were typed in the office. None of these witnesses were present in the courtroom when the others testified. The testimony of the witnesses was substantially consistent with each other thereby giving us a good deal of confidence in the accuracy of their statements. This testimonial evidence casts considerable doubt upon Whitten's story. To this Whitten simply states that their testimony is untrue and should not be accorded any weight. He argues that Griffith is a convicted felon and an attorney disbarred for practicing a scheme to defraud, [8] reasoning, therefore, that Griffith's testimony is inherently untrustworthy. He additionally states that Griffith was also audited *370 by respondent, and that during the course of the investigation, Griffith succeeded in convincing respondent to give him credit for the $191 per decree that he purportedly paid Whitten. Griffith also petitioned this Court, and, as of the date of trial, that case is still pending. We note that the circumstances surrounding this case cause us to view Griffith's testimony with some skepticism.At Griffith's future trial, any testimony given by him with reference to splitting his fees with Whitten will probably be used to help his cause. Quite possibly, if Griffith's was the only testimony which refuted Whitten's, we might view this case differently. But here we also have the testimony of Cook and Bowman which corroborates Griffith's story in substantial aspects. Whitten points to some inconsistencies between the testimony of these three witnesses as totally discrediting the evidence they presented. Over 8-1/2 years had passed between the events testified to and the time of trial. It is expected that memories fade as to certain details. After reviewing *371 the record, however, it is evident that while certain conflicts are apparent in the testimony, the witnesses were fully consistent as to material matters, most importantly, the delivery of cash to Whitten. On brief, petitioner speculates that Cook and Bowman testified in the manner they did so to avoid perjuring themselves by contradicting their testimony given in Griffith's mail fraud trial. What transpired in the mail fraud trial is irrelevant to this instant proceeding; however, assuming that Cook and Bowman implicated Whitten at the mail fraud trial and their testimony before us is simply a repeat of what they said before, petitioners have not advanced a motive to explain why they were previously less than truthful. Even assuming that their loyalty to Griffith was undivided, their testimony regarding Whitten, rather than exculpating Griffith, would further implicate him in the conspiracy scheme. In short, we find no reason to question their testimony. Furthermore, even if we discount the testimony provided by the witnesses, there is further reason why we cannot give credence to Whitten's story. Respondent introduced into evidence a letter written by Whitten to Bowman to *372 the effect that it was getting "hot" and that he needed a few legitimate names to put on divorce decrees. At trial Whitten denied writing this letter, but this letter was the only overt act alleged to have been committed by Whitten in the indictment to which Whitten pled guilty. This constitutes an affirmative admission by him that he sent this letter. Kreps v. Commissioner, 351 F. 2d 1 (2d Cir. 1965). Additionally, the plea of guilty itself is also an admission as to involvement in the scheme. [9] *373 *380 Kreps v. Commissioner, supra; United States v. Wainer, 211 F.2d 669 (7th Cir. 1954). His testimony here is inconsistent with his plea; both stories cannot be correct. In view of the overwhelming evidence presented, we choose to believe his earlier plea. [10] We, therefore, conclude that respondent has proved by clear and convincing evidence that Whitten received unreported income which was subject to tax during each of the taxable years in issue. The mere finding of receipt of income that was not reported on the return, standing alone, does not in and of itself prove fraud. This is especially true when the receipt of income *374 is found by this Court due to the taxpayer's failure to overcome the presumption of correctness attaching to respondent's determination. Drieborg v. Commissioner, 225 F. 2d 216 (6th Cir. 1955); Shaw v. Commissioner, 27 T.C. 561 (1956). Furthermore, even if omissions from income are affirmatively shown by respondent, the fraud penalty will not be imposed where the circumstances support a conclusion that the omissions were a result of negligence, inadvertence, or an honest mistake. This, however, is not the case before us, as here respondent has affirmatively shown a consistent pattern of omission of a specific item of income over a 4-year period. The consistent pattern of substantial understatement of income clearly shows scienter--the intent to evade tax. Where, as here, large amounts of income are consistently omitted and the taxpayer's testimony at trial is patently unbelievable, the conclusion is inescapable that the taxpayer omitted income with intent to evade tax. Holland v. United States, 348 U.S. 121 (1954); Archer v. Commissioner, supra.Byran v. Commissioner, supra.This conclusion is further buttressed in a case such as this where the recipient is well acquainted with *375 his obligations under the law. See Halle v. Commissioner, 7 T.C. 245 (1946). Moreover, the omissions of income, together with his past criminal conduct, indicate an intention to operate outside the law, conduct having as likely effect to mislead or conceal. Evidence of such conduct is indicative of fraudulent intent. See Rogers v. Commissioner, 111 F. 2d 987 (6th Cir. 1940). Thus, we are led to the inexorable conclusion that petitioner voluntarily and intentionally omitted substantial amounts of taxable income from his returns for 1967, 1968, 1969, and 1970, with knowledge that such amounts should have been included thereon. This is the gravaman of tax fraud. See Considine v. Commissioner, 68 T.C. 52 (1977). Therefore, the penalty provided for in section 6653(b) is applicable for each of those years. Petitioner lastly argues that respondent has failed to show what number of decrees, if any, were subject to the agreement between Whitten and Griffith during 1967 and 1968. He reasons that even if it is found that Whitten participated with Griffith, the evidence is not sufficient for us to conclude to what years the income is attributable; therefore, section 6501(a) requires our *376 finding no deficiency for 1967 and 1968. Although we believe that respondent has shown the number of decrees subject to the agreement for each tax year, see infra, it is not respondent's burden to prove the exact amount of the deficiency. See Byran v. Commissioner, supra; Estate of Kapple v. Commissioner, 70 T.C. 415, 427 (1978), revd. on other grounds 615 F.2d 91 (3d Cir. 1980). It is enough to show the receipt of some income that was not reported on petitioners' returns and that the returns were therefore false or fraudulent with intent to evade tax. Plunkett v. Commissioner, supra.Here, independently of the decrees, by direct testimony, respondent has shown petitoners to be in receipt of income which was not reported for both 1967 and 1968. As we have found that these omissions were due to fraud, section 6501(c) lifts the statutory bar to assessment and thus the issuance of the statutory notice for those years was timely. Omissions from income.
We must next determine the amount of the deficiencies for 1967, 1968, 1969, and 1970. Owing to the taxpayer's failure to keep books and records of his transactions with Griffith, responent found it impossible to reconstruct taxpayers' *377 income by resort to the net worth, bank deposits, or other familiar methods of income reconstruction. Instead, respondent reconstructed petitioners' income in the following manner. Relying on the lists compiled by Postal Inspector Davis from the files found in the anteroom in the Pell City Courthouse, respondent determined that 520, 637, 875, 266 divorce decrees had been subject to the agreement between Whitten and Griffith during 1967, 1968, 1969, and 1970, respectively. On brief respondent concedes that the actual number of decrees per year listed on the Davis list were 548, 693, 874, 244, for 1967, 1968, 1969, and 1970. Based on Cook's testimony at the mail fraud trial of Griffith, respondent determined that Whitten was paid on an alternating basis of $220/$162 per case. He multiplied the average fee, being $191, by the number of decrees per year which were found in the Pell City Courthouse. In preparing the notice of deficiency respondent's agent did not examine the underlying divorce decrees; he, therefore, had no knowledge as to the genuineness of Whitten's signature appearing thereon.Based on the above respondent determined a deficiency in petitioners' income taxes of $50,078.26 *378 for 1967, $68,358.34 for 1968, $104,038.92 for 1969, and $21,811.53 for 1970. Respondent's determination is presumed correct, and the burden is upon petitioner to prove the determination in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. This proposition is equally applicable to 1967 and 1968, the tax years which would have been otherwise closed in absence of our finding of fraudulent omissions from income. Bryan v. commissioner, supra;Cohen v. Commissioner, supra.Estate of Brame v. Commissioner, 25 T.C. 824 (1956), affd. per curiam 256 F. 2d 343 (5th Cir. 1958). Here, however, petitioner challenges respondent's determination as being arbitrary, unreasonable, and excessive and, thus, invalid. As such it should be accorded no presumption of correctness and given no effect. [10]Helvering v. Taylor, 293 U.S. 507 (1935); Welch v. Commissioner, 297 F. 2d 309 (4th Cir. 1961); Phillips' Estate v. Commissioner, 246 F. 2d 209 (5th Cir. 1957); Gasper v. Commissioner, 225 F. 2d 284 (6th Cir. 1955). The rule derived from the above cases is when petitioner has shown that the basis or the theory of arriving at the deficiency is erroneous, *379 then there is no burden of proof placed upon the taxpayer to show the correct amount of tax owing. Upon this showing it is then incumbent upon this Court to redetermine the deficiencies, without the benefit of any presumptions, based solely on the facts and evidence ascertained from the entire record. See, e.g., Nat Harrison Assoc. v. Commissioner, 42 T.C. 601 (1964). However, the burden is on the taxpayer in the first instance to demonstrate that respondent's basic theory in arriving at the deficiencies is arbitrary and unreasonable. Harbin v. Commissioner, 40 T.C. 373 (1963). Where no books and records are kept, respondent *381 has great latitude in reconstructing income. A taxpayer cannot properly complain, as petitioner does here, that respondent has disregarded more popular methods such as increase in net worth, bank deposits analysis, or personal expenditures method. Schellenbarg v. Commissioner, 31 T.C. 1269 (1959). The choice as to the method of reconstruction to be employed lies with respondent and not the taxpayer, the only restriction being that the method adopted be reasonable under the circumstances. Carson v. United States, 560 F. 2d 693 (5th Cir. 1977); Shellenbarg v. Commissioner, supra; Stone v. Commissioner, 22 T.C. 893 (1954). We also recognize that respondent's method need not determine income with mathematical certainty in order that the determination be reasonable and not arbitrary. Gordon v. Commissioner,63 T.C. 51 (1974). Here, in the face of petitioner's denial of receipt of any income and his failure to keep records indicating the correct amount of income he received from Griffith, respondent reconstructed his income based on known facts available to him and reasonable inferences drawn therefrom. Although we do not agree with all the inferences drawn by respondent, our disagreement *382 does not extend to the basic method employed by him. As such we do not think respondent acted arbitrarily, in the sense of being capricious, and we do not think respondent's method to be unreasonable under the circumstances. As our disagreement and concomitant adjustment to the deficiencies only extends to specific identifiable items, the presumption of correctness which otherwise attaches to the notice of deficiency is not destroyed. Commissioner v. Smith, 285 F.2d 91 (5th Cir. 1960); Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957). Mitchell v. Commissioner, 416 F.2d 101 (7th Cir. 1969). Where we believe that the evidence shows respondent to be in error, we have redetermined the deficiencies solely on the facts adduced from the record without the benefit of the presumption of correctness.See e. g., Nat Harrison Assoc. v. Commissioner, supra.
Payment date
Forming the basis of respondent's determination were the divorce decrees found in the anteroom and summarized on the lists compiled by Davis. It is respondent's theory that the dates appearing on the decrees are evidence of the date that petitioner was paid for his services. Petitioner disagrees and states that the lists *383 are meaningless to establish what year income was received.
It is quite possible that Whitten was paid on an earlier or later date for signing the decree which evidences a payment. However, petitioners have suggested no other reasonable possibility; they simply state that Whitten received no income, a conclusion which we do not believe. At the burden is on petitioners to prove respondent wrong, we sustain his determination. Moreover, we believe that the evidence introduced at trial, independent of the presumption of correctness, clearly supports this approach. We, therefore, hold that Whitten received his fee for each case on the date which appears on the decree. Fee per case
Respondent's determination that petitioner received an average fee of $191 per case was based solely on information obtained from Cook. She stated that she observed Griffith counting out cash on an alternating basis of $220 and $162. This cash was placed in an envelope for delivery to Whitten.Though Cook only was employed by Griffith until May of 1968, we do not think respondent was arbitrary or unreasonable in projecting this amount to all taxable years in issue in the absence of any contradictory evidence *384 brought to his attention. Cf. Gerardo v. Commissioner,552 F. 2d 549, 551, n. 3 (3rd Cir. 1977). In view of Whitten's complete denial of complicity with Griffith, petitioner introduced no evidence bearing on the correct amount of the fee received for each case. Under such circumstances, we would not be entirely unjustified in sustaining respondent's determination based on petitioner's failure to carry his burden of proving that respondent's determination is arbitrary. Nevertheless, we believe there is sufficient evidence in the record to indicate that respondent's determination was high and, therefore, erroneous. The basic facts are particularly within the knowledge of only Whitten and Griffith. As Whitten has shed no light on this matter, of necessity we rely solely on the testimony of Griffith. Griffith testified that petitioner received a fixed fee for each case which was approximately 50 percent of his total fee. He also testified that the attorney who referred the case received 40 percent of his fee. Griffith's fees ranged from a low of $275 to a high of $465. Although Griffith testified that respondent's determination with regard to the average fee was substantially *385 correct, the evidence indicates that this cannot be the case. Assume, for example, Griffith received his lowest fee for a case, $275. After paying Whitten $162, the lowest amount which respondent determined Whitten to have received for a case, and paying the forwarding attorney his 40-percent fee ($110), Griffith would be left with only $3.We cannot believe that Griffith only received $3 for some cases. Accordingly, we need to reduce the figures used by respondent. Although the evidence indicates that petitioner received 50 percent of Griffith's fee, unfortunately there is no evidence with which to determine the precise number of cases done by Griffith at each specific fee. We cannot, as petitioner suggests, find there is no deficiency simply because respondent has not shown the correct amount of tax to be owing. To do so would be "tantamount to holding that skillful concealment is an invincible barrier to proof," United States v. Johnson, 319 U.S. 503, 518 (1943). Neither can we sustain respondent's determination based on the presumption of correctness, because we believe respondent to be incorrect. Helvering v. Taylor, supra.As such, it is our duty to properly reevaluate *386 the evidence and reach our own findings, even though admittedly our result is only an approximation based on the record and the inferences drawn therefrom. Mitchell v. Commissioner, supra; Fiorella v. Commissioner, supra.
Accordingly, we find that petitioner received an average fee per case of $185. We reach this conclusion by taking 50 percent of the average range ($370) of the fees which Griffith stated he charged. Number of decrees subject to the Whitten/Griffith arrangement
As stated earlier, respondent's determination was arrived at by simply multiplying an average fee per case by the number of decrees found in Pell City and dated during each tax year in which the agreement between Whitten and Griffith was in effect. In computing the deficiencies, the revenue agent did not examine the underlying decrees but instead relied solely on a copy of the Davis list furnished to him. An examination of the divorce decrees indicates that while the majority of the decrees found were signed by petitioner, a substantial number of decrees did not bear petitioner's signature. Additionally, 53 decrees found in Pell City did not correspond with any names on Griffith's clients lists. Included *387 among these decrees were 17 documents signed by one J. H. Martin as solicitor.Also found were 34 annulments of varying lengths which could not have been presigned in blank by petitioner. Respondent argues that petitioner is properly chargeable with the receipt of income from all the decrees found in the Pell City Courthouse. The essence of his argument is that since all decrees were found in the anteroom off Whitten's office, he must have been paid for all the decrees found. The evidence establishes that Whitten received income relating to decrees (either standard divorce decrees or annulments) which bear his genuine signature and correspond to the parties as listed on Griffith's clients lists. We uphold respondent's determination insofar as it relates to these decrees. We do not however believe that Whitten received income with respect to the balance of the decrees found. The fact that the decrees were found in the anteroom in Pell City does not convince us all of these decrees were subject to the arrangement.Considerable doubt is cast upon the circumstances regarding just how the decrees were placed in the anteroom. The uncontroverted evidence adduced at trial indicates that *388 as late as November 1970, 2 months before Judge Waid discovered the decrees, the anteroom contained no such decrees. Secondly, although Griffith states that the divorce decrees were delivered to Whitten by his secretaries, their testimony indicates that this might not be the case. Finally, the closet where the decrees were found was easily accessible to anyone wishing to enter. We will not speculate as to who was responsible for placing the decrees in the closet, but it will suffice to say that we do not believe that Whitten placed these decrees there, 2 months before leaving office, and under circumstances indicating that they would certainly be discovered by his successor. Furthermore, the evidence indicates that the majority of the decrees upon which petitioner's name was forged were written by one and the same person. Moreover, Whitten's name was signed in a skillful manner so that only one who was familar with his signature could detect the forgery. Neither party introduced evidence bearing on the identity of the party responsible for the forgery. Both parties on brief, however, speculate as to the culprit. We cannot agree with respondent's conclusion that someone under *389 petitioner's control was responsible. We strongly doubt that after going to all the trouble to perpetrate this scheme Whitten would take someone into his confidence to engage in the simple act of signing his name, an act which would hardly cause Whitten any trouble. We believe it more likely that Griffith or someone under his control forged Whitten's name. First of all, the standard, preprinted decrees were readily available to Griffith. secondly, by signing Whitten's name, Griffith could avoid paying Whitten his fee. Accordingly, we find Whitten not properly chargeable with receipt of fees relating to divorce decrees upon which his name was forged. This finding is fully consistent with our holding that petitioner did receive income from fees for divorce decrees upon which Whitten's signature was genuine. Our finding that Whitten is linked to those decrees is not based on the fact that the decrees were discovered in the anteroom, but rather on the independent evidence of Whitten's agreement with Griffith to sign divorce decrees in exchange for a fee. For this reason we disagree with petitioner's contention that he did not receive income in return for his signing the annulment *390 decrees. Although these decrees were not subject to the normal agreement in that they could not have been pre-signed in blank, this in no way negates the essential fact that petitioner was to be paid for his signature. as such, we find that petitioner received a fee for the annulment decrees to the extent his genuine signature appears thereon. We also do not think that Whitten received fees relating to divorce files found in Pell City which do not correspond with any name on Griffith's clients lists. These files were not subject to the agreement with Griffith and, therefore, petitioner received no fee from him.It may well be that Whitten was paid by someone else, but there is no evidence in the record to support this conclusion. We therefore find that petitoner did not receive income with respect to these 53 decrees. Included in these 53 decrees are the 17 decrees which were signed by J. H. Martin. As the evidence does not indicate the tax years to which these 53 decrees relate, we cannot determine on the basis of the record the precise amount of the omissions from income for each taxable year. In summary, and as a basis for the parties' computation under Rule 155, Tax Court Rules of Practice and Procedure, *391 we find the following. Petitioner received $185 for each divorce or annulment decree found in the Pell City Courthouse which bears his genuine signature [11] and which corresponds to a party's name on Griffith's clients lists. We additionally find that petitioner was paid for each decree on the date listed thereon. Innocent Spouse
The final issue for decision is whether Mary is an innocent spouse entitled to relief *392 from liability as provided for by section 6013(e). Section 6013(e)[12] provides that in certain circumstances a spouse who has filed a joint return will be relieved of liability for tax (including interest and penalties) to the extent such liability results from omissions from gross income attributable to the other spouse. In order for Mary to qualify for the relief provisions provided by the statute, the following conditions must be satisfied for each year in question: (A) There must have been omitted from gross income an amount properly includable therein attributable to Whitten which is in excess of 25 percent of the gross income stated in the joint return; (B) Mary must establish that in signing the return she did not know of, and had no reason to know of, the omissions from income; and (C) taking into account whether she significantly benefited from the items omitted from gross income and all other facts and circumstances, it is inequitable to hold her liable for the deficiencies in tax.Petitioner bears the burden of proving that each of the conditions set forth in the statute has been satisfied. Fox v. Commissioner, 61 T.C. 704, 716 (1974); Adams v. Commissioner, 60 T.C. 300, 303 (1973). *393 Respondent contends that neither of the requirements *394 imposed by section 6013(e)(1)(B) and (C) have been met. Petitioners argue to the contrary. After considering Mary's testimony and the other evidence, we agree with petitioners. Section 6013(e)(1)(B) requires that petitioners establish not only that Mary had no actual knowledge of the omissions but also that she had no reason to know of the omissions. The evidence indicates that Mary on occasions met to exchange packages with Bowman at Eastwood Mall. Contained in these packages she received was cash which she delivered to Whitten. Respondent maintains that this conclusively shows that she knew that Whitten was receiving income which was not reported on the returns. We disagree. Based on Mary's testimony, we are satisfied that she had no actual knowledge of the omitted income. She testified in a forthright and candid manner, and respondent has put forth no evidence which in any way discredits her testimony. Bowman stated that there was never any discussion concerning cash during her meetings with Mary. She additionally stated that: (1) When delivered to Mary the packages were sealed, and (2) there was no way of knowing the contents of the packages without opening them. Mary *395 testified that she neither opened the packages nor questioned Whitten about their contents. As we have confidence in Mary's credibility, we hold that she had no actual knowledge of the omissions of income on the returns. Our inquiry cannot end here as respondent asserts that these facts also provide Mary with a reason to know of the omissions from income. In order to establish that she had no reason to know of the omissions from income, Mary must demonstrate that there were no facts within her knowledge which would cause a reasonably prudent taxpayer to have known of the omissions. Sanders v. United States,509 F. 2d 162 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1172 (1979). We find that Mary has carried this burden. Under normal circumstances, one's suspicions might be aroused by a meeting in a shopping mall, the purpose of which was to exchange packages. However, it was not unusual for Mary to meet lawyers and transmit documents between them and her husband. This practice is consistent with the testimony of Judge Waid in regard to the informal manner of the legal proceedings in St. Clair County. Mary also testified that the only time she met with her husband's *396 associates was if she was in the vicinity on her own personal business. Therefore, the circumstances surrounding these infrequent meetings do not suggest some clandestine operation and would not necessarily arouse the suspicions of a reasonably prudent person. If implicit in respondent's contention is the argument that Mary should have opened her husband's packages, we can only say that the statute does not go that far. Respondent next contends that Whitten was involved in a conspiracy and did in fact receive money pursuant thereto; as a spouse cannot close her eyes to what is going on around her, if she did not know of the conspiracy, she should have. To be sure, as respondent contends, a spouse cannot close her eyes to facts brought to her attention, see Mysse v. Commissioner,57 T.C. 680 (1972), but the statute does not require her to recognize that which she cannot see. For the tax years 1967, 1968, and 1969 there is absolutely no evidence, either direct or circumstantial, which indicates any facts were brought to Mary's attention which would indicate that Whitten was in receipt of substantial amounts of income, or involved in a conspiracy to defraud. First, all witnesses, *397 including respondent's, who were familiar with the Whitten's lifestyle testified that it could be described as modest. All evidence indicates a complete absence of lavish or unusual expenditures, [13] during the taxable years in issue. Compare Mysse v. Commissioner,supra, with Estate of Jackson v. Commissioner,72 T.C. 356 (1979). Additionally, Mary did not participate in business affairs or family bookkeeping. Compare Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F. 2d 617 (7th Cir. 1975). All financial matters, including the paying of bills were handled by Whitten. Moreover, Mary did not participate in the preparation of the Federal income tax returns for the years in issue. Additionally, even assuming that Mary participated in the family's financial affairs, it is conceded that none *398 of Whitten's ill-gotten gains were placed in the family's bank accounts or safe deposit boxes where they were discoverable by her. Furthermore, there is no indication that expenditures necessary to support petitioners' lifestyle were in excess of reported income for those years. During the tax years in issue, the Whittens reported between $13,000 and $17,000 as gross income on their returns. From the information gleaned from the record, their expenses did not even approach this figure.Compare Estate of Jackson v. Commissioner,supra.
For the tax year 1970, the facts differ. On August 20 of that year, Whitten was indicted for conspiracy to defraud. The return for that year was signed in April 1971. Although we do not believe that an indictment per se imparts knowledge of omissions from income, we also believe that this fact cannot be ignored. As Whitten denied all complicity in the scheme, the question becomes whether Mary was reasonable in her belief that her husband was telling the truth. As the factors mentioned above show an absence of all indicia of receipt of income, we do not believe that it was unreasonable under the circumstances for Mary to have accepted as true her *399 husband's denial of the offense charged in the indictment.
We also find that Mary derived no significant benefit from the unreported income. The term "benefit" as defined in the statute means more than payment for ordinary support. See S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), 1971-1 C.B. 606, 607-608. The gist of respondent's argument is as follows: Income [which was received by Whitten] was far in excess of reasonable living expenses. If Whitten engaged in any activities to the exclusion of Mary which required large expenditures of money, the burden of proof was on the petitioners, and they have not met this burden. We believe they have. Initially, although we have found that Whitten received substantial amounts of income, all evidence indicates that it has not as yet been spent. Respondent's own investigation also confirms that the money has not turned up in any jointly held assets, bank accounts, or safety deposit boses. All indications lead us to the conclusion that Whitten is hoarding this money to Mary's exclusion, and therefore, not only has Mary not significantly benefitted from the omitted income, she has not benefitted at all. Secondly, even if Whitten has *400 applied the omitted money to support the family, it is clear that he has provided no more than ordinary support. All witnesses described the Whittens' lifestyle as modest, in fact it appears that their lifestyle has somewhat diminished subsequent to Whitten's receipt of the funds. They are now living in a two-room guesthouse on the property of Whitten's brother; whereas before they had owned their own home. We realize that at the time of trial the Whittens were still married, and the possibility exists that Mary might benefit in the future. However, the statute does not limit its benefits to those spouses who are deserted, divorced, or separated. Mysse v. Commissioner,supra at 699. We additionally do not think that the statute requires us to speculate on what may occur subsequent to the date of trial. Therefore, as Mary has not heretofore benefitted from the unreported income, we find it inequitable to charge her with the liability incurred by her husband on his unreported income. Although we have found that the conditions set forth in section 6013(e)(1)(B) and (C) are satisfied, Mary cannot prevail unless the omissions from income exceed 25 percent in each tax year. Sec. 6013(e)(1)(A). *401 Though there have been considerable omissions from income for the 4-year period under consideration, we cannot be certain that the omissions in each year exceed 25 percent. We, therefore, reserve decision on this issue until the computation under Rule 155, Tax Court Rules of Practice and Procedure, is filed by the parties pursuant to our decision. Decision will be entered under Rule 155. Footnotes
1. Petitioners have conceded that respondent's adjustment with respect to the 1971 taxable year is correct. When we hereinafter refer to the taxable years in issue, we will be referring only to the years 1967 through 1970.↩
2. All section references are the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated.↩
3. As will be evidenced infra, the evidence with respect to his meeting between Whitten and Griffith and the arrangement emanating therefrom is very conflicting. Whitten testified that he had no arrangement with Griffith and received no fees from Griffith. Griffith testified that he and Whitten entered into an agreement, the details of which we have set out as our findigs of fact. Griffith's testimony was supported by the testimony of his two secretaries.Our difficult task is to determine whom to believe. Based on all the evidence and our observation of the witnesses, and keeping in mind that Griffith presently has a case pending in this Court involving his taxable income for the years here involved, we have concluded that there was an arrangement between Whitten and Griffith to split fees on "quickie" divorces filed by Griffith in Whitten's court. Since Whitten provided us with no terms of such an arrangement, we have had to accept Griffith's version, with some modifications. The evidence with respect to how the arrangement was carried out is also conflicting and leaves many unanswered questions such as why the divorce decrees were not recorded and how they got into an anteroom off of one of Whitten's offices, where they were discovered by Whitten's successor in office. The parties disagree on the number of the unrecorded decrees that bore Whitten's signature, although both acknowledge that a large number of them were forged. And there is uncertainty about the amounts Whitten received for the decrees he signed. We have done our best to reconcile the discrepancies and come up with what seems to us to be a reasonable conclusion.
4. These preprinted forms were generally available throughout the State. On or about May 11, 1966, Griffith received 1,000 of such forms.
n4a Although it would have certainly been helpful to our understanding of the facts is this case, neither party called Ann Love as a witness in this case.↩
5. The arrangement would have seemed more realistic if Griffith had agreed to pay Whitten 50 percent of the net fee after deducting the forwarding fee and kept the other 50 percent himself. However, there is no evidence that such was the arrangement. Perhaps this accounts for the fact that Whitten's name was forged to many of the decrees that we discuss later, which form the basis of this case.↩
5a. Griffith stated that the secretaries were given two envelopes, one containing cash and the other containing completed divorce decrees. Cook stated that she was usually given just one envelope; as this envelope was always sealed, she had no way of knowing its contents. She did, however, on more than one occasion observe Griffith placing smaller envelopes containing cash into the large envelope which she delivered to Whitten. Bowman also stated that Griffith would only give her one envelope to give to Whitten. The envelopes "felt lumpy" and were not large enough to hold divorce decrees in an unfolded form.
5b. Whitten denied that he wrote this note.↩
6. There is no evidence of how, when, by whom, or why these files were put in the anteroom without recordation of the decrees. Both Warden and Whitten testified that they knew nothing about the files in the anteroom. We have no reason to doubt Warden's testimony, and we believe it highly unlikely that Whitten would have put the files in the anteroom and walked off and left them for his successor to find.↩
7. See infra↩.
8. We note that this statement appears to be a case of the pot calling the kettle black, as the same is equally applicable to Whitten.↩
9. However, we reject respondent's contention that this guilty plea collaterally estops petitioner to deny the receipt of funds. A guilty plea only estops petitioner to deny facts which are ultimate in the first proceeding. Goodwin v. Commissioner, 73 T.C. 215 (1979). The receipt of funds is not necessary to support a conviction under 18 U.S.C. 371. Although the object of the conspiracy was to obtain funds, the success of the venture is not necessary to support a conviction. Collins v. United States, 284 F.2d 517 (6th Cit. 1960, cert. denied 365 U.S. 837 (1961). The cases cited by respondent to support his contention are clearly distinguishable. See Barrasso v. Commissioner, T.C.Memo. 1978-432, affd. sub nom. DeCavalcante v. Commissioner,     F.2d     (3d Cir. Apr. 16, 1980). By making this argument, petitioner does not appear to attack respondent's determination as falling under the "naked assessment" rule, not subject to the normal rules with regard to the burden of proof.See United States v. Janis, 433 U.S. 441 (1976). Although there is some conflict as to the scope of this rule, see and compare Weimerskirch v. Commissioner, 596 F. 2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); with Jackson v. Commissioner, 73 T.C. 394 (1979). We need not resolve this conflict as the assessment sub judice cannot be termed naked under any interpretation of the rule. This is not a case where respondent has introduced no evidence supporting his determination, being content to rest solely on the presumption of correctness. See Jackson v. Commissioner, supra.Respondent here has produced evidence independent of the notice of deficiency linking petitioner to the incomeproducing activity and the receipt of income during all tax years in issue. When presented with such evidence, both this Court and the Ninth Circuit agree that the "naked assessment" rule has no application. Avery v. Commissioner, 574 F.2d 467 (9th Cir. 1978). Llorente v. Commissioner, 74 T.C.     (May 13, 1980). See also Carson v. United States, 560 F.2d 693 (5th Cir. 1977); Gerardo v. Commissioner552 F.2d 549 (3d Cir. 1977), at 554, n. 8. The only argument made by petitioner which might possibly be relevant to this issue was that the initial determination was based on hearsay evidence. This Court has previously decided that the fact that respondent's determination is based on hearsay evidence does not, by itself, cause the notice to lose its initial presumption of correctness. Jackson v. Commissioner, supra at 400. Llorente v. Commissioner, supra at    .
[10]↩ Petitioner states that he pled guilty in order to obtain a reduced sentence. Under some circumstances this might be good reason to discount the weight given to these admissions which are now inconsistent with his story. These circumstances do not exist here though, for in addition to his 6-month jail sentence, Whitten also lost his license to practice his livelihood. Under such circumstances, we do not think Whitten's prior guilty plea is inherently untrustworthy.
11. The parties are in disagreement as to the exact number of the decrees which were forged. The record was left open for the parties to ascertain the number of decrees which were forged. Respondent's expert examined 954 decrees to determine the genuineness of F. O. Whitten's signature. Petitioner Whitten examined all the decrees for the same. Of the 954 decrees that both parties examined, there was specific disagreement as to only 74 decrees. As to these 74 decrees, we accept respondent's expert as being correct. Where respondent's expert has made no determination, we accept petitioner's finding as correct. Where the parties were unable to determine the genuineness of the signature, petitioner is to be charged with income from the decree as he bears the burden of proof.↩
12. Sec. 6013(e) provides in part: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
13. The only expenditures which could conceivably be considered lavish were the purchases of automobiles by both Whitten and Mary and the purchase of a fur coat worth $300 or $400.Respondent does not argue that these expenditures were inconsistent with petitioners' lifestyle. We agree that the circumstances in this case support this conclusion. See Mysse v. Commissioner,57 T.C. 680↩ (1972).